# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

DALE E. McCORMICK,

    *Plaintiff*,

vs.

Case No. 07-2605-EFM

ROGER WERHOLTZ, et al.,

    *Defendants.*

## MEMORANDUM AND ORDER

This is a section 1983 action brought by a pro se plaintiff challenging the application of certain prison regulations to him. Plaintiff Dale McCormick, an inmate at Lansing Correctional Facility (LCF), alleges that Defendants Jim Collins, formerly the Designated Facility Representative for Publications Review at LCF, and Roger Werholtz, Secretary of the Kansas Department of Corrections, violated his First Amendment right to receive information by withholding from him two books that he had ordered from a bookseller. This matter is now before the Court on the parties' cross-motions for summary judgment (Doc. 77 & 79). For the reasons stated below, the Court grants in part and denies in part Defendants' motion and denies in its entirety Plaintiff's motion.

### I. Background

Sometime in September of 2007, Plaintiff, an inmate in the custody of the Kansas Secretary of Corrections, incarcerated at LCF, ordered three books from a bookseller: (1) *2007 Writer's*

*Market*, (2) *Encyclopedia of Survival Techniques*, and (3) *High Risk: An Anthology of Forbidden Writers*. Two of these books, *Encyclopedia of Survival Techniques* (which contains information on survival tactics, making a crude bow and arrow and other weapons/traps, as well as navigating in the wilderness) and *High Risk: An Anthology of Forbidden Writers* (which contains multiple explicit descriptions of a variety of sexual acts, including incest and child molestation) were never delivered to Plaintiff. Defendant Collins, the Designated Facility Representative for Publications Review at LCF at the time, determined that they violated certain prison regulations.[1] More specifically, Defendant Collins believed that *Encyclopedia of Survival Techniques* posed a clear threat to the safety and security of a correctional facility as escape material in violation of Kansas Administrative Regulation 44-12-601(1)(a)[2] and that *High Risk: An Anthology of Forbidden Writers* contained sexually explicit material in violation of Kansas Administrative Regulation 44-12-313.[3]

---

[1] At LCF, if an incoming publication contains prohibited content, the entire publication is censored.

[2] Regulation 44-12-601(d)(1)(a) states:

(1) Incoming or outgoing mail, other than legal, official, or privileged mail, may be censored only when there is reasonable belief in any of the following:
    (A) There is a threat to institutional safety, order, or security.

[3] Regulation 44-12-313 provides:

(a) No inmate shall have in possession or under control any sexually explicit materials, including drawings, paintings, writing, pictures, items, and devices.
(b) The material shall be considered sexually explicit if the purpose of the material is sexual arousal or gratification and the material meets either of the following conditions:
    (1) Contains nudity, which shall be defined as the depiction or display of any state of undress in which the human genitals, pubic region, buttock, or female breast at a point below the top of the aerola is less than completely and opaquely covered; or
    (2) contains any display, actual or stimulated, or *description* of any of the following:
        (A) Sexual intercourse or sodomy, including genital-genital, oral-genital, anal-genital, and anal-oral contact, whether between persons of the same or differing gender;
        (B) masturbation
        (C) bestiality; or
        (D) sadomasochistic abuse . . . .

Defendant Collins informed Plaintiff of his decision to censor the books by issuing two "KDOC Notification[s] of Publication Seizure/Censorship" to Plaintiff. These notifications, in addition to stating that two of Plaintiff's books had been censored, outlined the procedure for seeking administrative review of the censorship decisions. Following the procedure listed, Plaintiff filed two appeals, one for each book.

In his appeals, Plaintiff argued that the censorships were infirm because prison officials cannot legally censor materials in one source while at the same time providing access to identical materials in another source. According to Plaintiff, LCF not only broadcasts television programs, such as *Man v. Wild* and *Survivorman*, that contain information on survival tactics, but it also provides to inmates, through its library, numerous books and magazines that contain content similar to that found in the books censored.

Secretary of Corrections' Designee, Elizabeth L. Rice,[4] reviewed Plaintiff's appeals. Finding that "the response rendered by the mail review officer [Defendant Collins] [wa]s appropriate," Rice rejected both appeals.[5] On December 31, 2007, Plaintiff filed a complaint in this Court, challenging both his underlying felony conviction and the censorship of his two books. Plaintiff's original complaint has since been amended twice. Plaintiff's complaint now asserts only one claim: that Defendants violated his First Amendment right to receive information. Both parties have filed motions for summary judgment. The Court has reviewed the material submitted and is ready to issue its rulings.

---

[4] Ms. Rice was appointed by Defendant Werholtz to carry out the appellate administrative review of decisions made by the Designated Facility Representative.

[5] *See* Docs. 45-5 & 45-6. As stated in Defendants' *Martinez v. Aaron* report, Plaintiff has exhausted all available administrative remedies regarding this matter.

## II. Standard of Review

The Court is familiar with the standards governing the consideration of summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[6] An issue is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[8] In considering a motion for summary judgment, the Court must examine all of the evidence in a light most favorable to the nonmoving party.[9]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to summary judgment.[10] The moving party is not required to disprove the nonmoving party's claim or defense, but must only establish that the factual allegations have no legal significance.[11] If this initial burden is met, the nonmovant must then set forth specific facts showing that there is a genuine issue for trial.[12] In doing so, the opposing party may not rely on mere allegations or denials in its pleadings, but must present significant

---

[6] Fed. R. Civ. P. 56(c).

[7] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003).

[8] *Id.*

[9] *Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557 (10th Cir. 2001).

[10] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[11] *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

[12] *Celotex*, 477 U.S. at 323.

admissible probative evidence supporting its allegations.[13]  The Court is also cognizant that it may not make credibility determinations or weigh the evidence when examining the underlying facts of the case.[14]

Finally, the Court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15]

### III.  Analysis

Although inmates have a First Amendment right to information while in prison, this right is not without limits.[16]  Prison regulations may constitutionally impinge on this right so long as they are "reasonably related to legitimate penological interests."[17]  To determine whether a regulation is reasonably related to legitimate penological interests, the court applies the deferential four factor test set forth in *Turner v. Safley*[18]: "(1) whether a valid and rational connection exists between the regulation and the asserted legitimate governmental interest, (2) whether alternative means of exercising the constitutional right remain available to inmates, (3) any effect accommodating the right would have on guards and inmates, and (4) the absence of

---

[13]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

[14]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[15]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[16]*See Jacklovich v. Simmons*, 392 F.3d 420, 426 (10th Cir. 2004).

[17]*Turner v. Safley*, 482 U.S. 78, 89 (1987).

[18]*Id*.  This four-factor test applies irrespective of whether the plaintiff has brought a facial or an as applied challenge.  *See, e.g., Shaw v. Murphy*, 532 U.S. 223, 232 (2001); *Boles v. Neet*, 486 F.3d 1177, 1181 n.4 (10th Cir. 2007).

ready alternatives."[19] "The burden . . . is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."[20]

**1. Connection Between the Regulation in Question and Interest Asserted**

The first Turner factor requires a multifold analysis: "[the court] must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective."[21] Here, Defendants claim that both of Plaintiff's books were censored in order to preserve institutional security. It is well established that institutional security is a legitimate interest.[22] Defendants further contend that the books were censored solely because of the effect they could have on prison security. As recently stated by the Tenth Circuit, "where prison officials draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are neutral."[23] Therefore, the only question that remains is whether there is a rational connection between KDOC's interest in security and the censoring of each of Plaintiff's two books. To establish this connection, and thus enable the Court to award summary judgment in its favor, Defendants must make a *minimal showing* that a rational connection exists between the action taken and the interest asserted.[24] Because factor one "is actually more of an element than a factor in the sense that it is not simply

---

[19]*Jacklovich*, 392 F.3d at 426.

[20]*See Overton v. Bazzetta*, 539 U.S. 126, 132 (2003).

[21]*Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989).

[22]*See, e.g., Thornburgh*, 490 U.S. at 415.

[23]*Jones v. Salt Lake County*, 503 F.3d 1147, 1153 (10th Cir. 2007) (internal quotations omitted).

[24]*Boles*, 486 F.3d at 1181; *accord Beerheide v. Suthers*, 286 F.3d 1179, 1186 (10th Cir. 2002).

a consideration to be weighed but rather an essential requirement,"[25] if Defendants fail to make this minimal showing, their summary judgment motion should be denied.[26]

### A. *High Risk: An Anthology of Forbidden Writers*

Defendants claim that *High Risk: An Anthology of Forbidden Writers* was censored pursuant to K.A.R. 44-12-313 because Defendant Collins determined that it contained descriptions of sexually explicit acts. To establish the connection between censoring books that contain descriptions of sexually explicit acts and KDOC's interest in security, Defendants have offered an affidavit prepared by Defendant Werholtz. This affidavit sets forth, among other things, various rationales for K.A.R. 44-12-313. Specifically, it states:

> 5. In [Werholtz's] experience as a Senior Corrections Administrator, [he has] found that *depictions of nudity* in any form generally tend to disrupt the overall security of a correctional facility. All KDOC facilities employ persons of both genders, and these depictions can be used to sexually harass staff members. Such depictions also tend to lead to open masturbation and other activities that disrupt overall security and order.
>
> 6. One concern, among others, is magazines which cater to male homosexual readers. When these magazines are received by individual inmates, they can be immediately identified as homosexuals by other inmates in the facility's population. Open homosexuals have been known to be targeted for exploitation and/or attack by other inmates. The regulation does not contain a specific prohibition on depictions of only male nudity or sex acts in order to keep the regulation gender-neutral.
>
> 7. Another concern addressed by [K.A.R. 44-12-313] is the potential for such depictions to promote paraphilias and sexual deviance associated with an abnormal and distorted focus on certain parts of human anatomy. Best practices in current corrections management of sex offenders includes addressing, managing, and treating paraphilias manifested by sex offenders. The prohibition in question directly serves that purpose.

---

[25]*Boles*, 486 F.3d at 1181 (internal quotation marks omitted).

[26]*See Jordan v. Pugh*, 504 F. Supp. 2d 1109, 1125 (D. Colo. 2007) (stating that if the court determines that there is no rational relationship between a regulation and a penological interest . . . the [c]ourt need not look at any other factor").

8. If the Department were to remove said prohibition, correctional staff would be given a significantly greater burden in attempting to enforce the intent of the regulation and to successfully manage sex offenders in the prison population who receive such literature by illicit dealing and trading with other non-sex offenders inmates.

In his response, Plaintiff argues that Werholtz's affidavit fails to demonstrate a valid or legitimate penological objective in censoring *High Risk: An Anthology of Forbidden Writers*. Plaintiff's argument is premised principally on what he perceives to be two glaring omissions in Werholtz's affidavit: first, the affidavit does not discuss how censoring materials that describe sexually explicit acts is related to KDOC's interest in security; second, assuming that the concerns listed in the affidavit are actually raised by depictions of nudity, Werholtz does not state that descriptions of sexually explicit acts raise the same concerns. In their reply, Defendants contend that Plaintiff's argument is flawed because it "wholly ignores" the contents of paragraphs six, seven, and eight of the affidavit.[27]

After reviewing the affidavit, the Court finds that Defendants' argument is without merit. Paragraphs six, seven, and eight are insufficient to establish the necessary link. To begin with, it is not clear how the material in paragraph six is even relevant to this case: Plaintiff's books were not banned because they referenced homosexual activity. Furthermore, paragraph seven, when viewed within the context of the entire affidavit, appears to be referring to problems arising from depictions of nudity. While it may be possible that paragraph seven is discussing problems associated with *descriptions* of sexually explicit acts, rather than actual *depictions*, it is not clear that it is. The affidavit in question is Defendants, offered to meet its requirement of making a

---

[27]It appears that Defendants' concede the fact that paragraph five does not show that there is a logical connection between censoring books containing *descriptions* of sexually explicit acts and KDOC's penological interest in security. In their attempt to rebut the argument made by Plaintiff in his response, Defendants rely solely on the content found in paragraphs six, seven, and eight.

minimal showing of a rational connection between the action taken and the interest asserted. Though the burden is low, the Court cannot say Defendant has met it. If Defendants wanted to demonstrate to the Court that the ban on materials *describing* sexually explicit acts, rather than *depicting* them, addresses the concern that such material can promote paraphilias and sexual deviance associated with an abnormal and distorted focus on certain parts of human anatomy, then paragraph seven should have referenced descriptions rather than depictions.

Lastly, paragraph eight seems to address concerns associated with rehabilitation of sex offenders, not security. Therefore, it too is sufficient to establish the connection.

Because Defendant Werholtz's affidavit does not show that there is a rational connection between Defendant Collins' decision to censor *High Risk: An Antology of Forbidden Writings* and KDOC's interest in security, and because this affidavit is the only evidence put forth to establish the requisite link, the Court must deny Defendants' motion as it relates to that book. The Court's ruling in this case is the result of Defendants' utter failure to supply the Court with *any* evidence that supports their asserted rationale. The affidavit submitted does not appear germane to the facts of this case. Based on its content, it appears to the Court that this affidavit was actually prepared for a different case.[28] The Court is willing to follow the Supreme Court's mandate to defer to the judgment of prison officials.[29] However, before it can do this, the Court must have a minimal showing of a rational basis for the official's judgment.

---

[28] With the exception of a couple of words, the affidavit in this case is a verbatim copy of the affidavit provided by the defendants in *Strope v. Collins*, 2008 WL 2435560, at *1 (D. Kan. June 12, 2008), a case reviewing a prison official's decision to censor a publication that contained "depictions of bare buttocks." Although the affidavit may have been relevant to that case and central to a successful outcome there, it is misplaced here. A few simple moments and attention to drafting a new affidavit here, based on the facts of this case, may have yielded a different result.

[29] *See, e.g., Overton*, 539 U.S. at 132 (stating that courts must "accord *substantial deference* to the professional judgment of prison administrators").

With respect to Plaintiff's motion for summary judgment on this matter, the Court also denies it. In his motion, Plaintiff argues that Defendants could not have a reasonable, logical or legitimate penological objective or interest in censoring *High Risk: An Anthology of Forbidden Writings* because the prison makes available to prisoners material that contains similar content. Plaintiff states that there are a number of books in LCF's library, some of which have recently been added, that contain content similar to that found in *High Risk: An Anthology of Forbidden Writings*. He further alleges that there has been no effort by prison officials to remove library books that contain descriptions of sexually explicit acts. In their response, Defendants controvert Plaintiff's allegation that prison officials have made no effort to remove material that contains descriptions of sexually explicit acts, and state that they lack sufficient knowledge to respond to Plaintiff's statement that there are a number of books in the library with similar content, Defendants.

As is obvious from above, a dispute of material fact exists as to whether prison officials have made an effort to remove materials that contain descriptions of sexually explicit activity from LCF's library. As a consequence, the Court denies Plaintiff's motion as it relates to the censoring of *High Risk: An Anthology of Forbidden Writings*.

### B. Encyclopedia of Survival Techniques

To establish the connection between Defendant Collins' decision to censor *Encyclopedia of Survival Techniques* pursuant to K.A.R. 44-12-601(d) and KDOC's interest in security, Defendants have offered affidavits prepared by Defendant Werholtz and Defendant Collins. Werholtz's affidavit, as it relates to K.A.R. 44-12-601(d), states:

> 9. Additionally, KDOC, as part of the criminal justice system, is charged with providing safe and effective containment and supervision of inmates and actively

encouraging and assisting offenders to become law-abiding citizens. K.A.R. 44-12-601(d) was designed, in part, to aid KDOC staff in addressing such concerns.

10. Per K.A.R. 44-12-601(d), incoming or outgoing mail, other than legal, official, or privileged mail, may be censored only when there is reasonable belief in any of the following: (A) There is a threat to institutional safety, order, or security; (B) there is a threat to the safety and security of public officials or the general public; or (C) The mail is being used in furtherance of illegal activities . . . .

11. Allowing inmates to order or receive publications that detail or contain information on how to survive in the wild is material that could aid inmates in escaping from a facility and avoiding detection and capture. Such publications would threaten and impede KDOC's ability to maintain, control, or confine inmates.

12. Publications that detail or contain such escape or survival information also threaten public safety. If inmates escape from prison, KDOC officials cannot monitor or control them, placing members of the public at risk of physical harm.

13. Additionally, such publications could provide encouragement and means for an inmate to escape from prison, thereby violating additional laws, which would negatively impact KDOC's ability to rehabilitate the inmate.

Collins' affidavit adds the following:

9. In recent years KDOC has had at least two inmates escape. During these escapes, the inmates were able to leave the state and travel undetected across the country. Maps played an integral role in planning and carrying out those escapes.

10. At LCF in particular, the Missouri river is a natural barrier blocking escape routes directly east of the facility. Survival books often contain detailed instructions on how to build rafts or other flotation devices to aid in fording rivers or other bodies of water. This could help an escaped inmate not only in crossing the Missouri river, but floating downstream without detection. Escapees could travel much further south than suspected, without stealing a boat or otherwise raising an alarm.

11. Additionally, often survival books contain instructions on avoiding capture, navigating in the wild, setting traps, etc. Such information or instructions would aid an inmate who was trying to escape. Most escapees are caught because law enforcement know where to look (relatives, friends, etc). Survival books would help reduce an escapee's need to rely on such people for help. Knowing how to live off the land, avoid detection, and navigate in the wild could help an inmate stay undetected for a longer period of time. Escapees could travel much further

-11-

away, increasing their chances of success, and placing many more people in jeopardy for longer periods of time.

12. Because *The Encyclopedia of Survival Techniques* contained a number of passages and illustrations potentially useful to an inmate planning to escape from a correctional facility, I believed it presented a threat to institutional safety, order, and security, in accordance with K.A.R. 44-12-601(d)(1)(A).

In his response, Plaintiff appears to concede that Defendants have met their "minimal burden" of producing evidence that shows that a link exists. However, Plaintiff argues that the link between Defendant Collins' decision and the interest asserted is so remote as to render the decision at issue arbitrary or irrational. Plaintiff's bases his argument on his belief that Defendants themselves provide numerous sources of wilderness survival information to inmates. According to Plaintiff, LCF not only broadcasts on its cable television system programs that show viewers how to survive in the wilderness, but it also makes available in its library books and magazines that are "devoted to hunting, fishing, trapping, camping, and related wilderness activities."

In their reply, Defendants contend that Plaintiff's argument has no legal basis. Defendants claim that the fact that Plaintiff may access to similar content elsewhere is immaterial. The only relevant question under factor one according to Defendants is whether the action taken was rational. If it is, then factor one favors them.

First, the Court finds that Defendants have made their minimal showing. Defendants' affidavits, which set forth the various security concerns that the ban on survival books is intended to address, establish the necessary link between Collins' decision to censor *Encyclopedia of Survival Techniques* and KDOC's interest in security. The Court now turns to Defendant's contention.

After reviewing the relevant case law, the Court agrees with Defendants that Plaintiff has misconstrued the nature of factor one's inquiry. Plaintiff argument fails to appreciate just how deferential the *Turner* test is. Factor one merely asks "whether the defendants might reasonably have thought that the [action taken] would advance its interests."[30] This factor is not concerned with whether a regulation or action is the least restrictive alternative or is absolutely necessary to further an important interest. As a consequence, evidence that would otherwise raise a factual issue if a heightened level of scrutiny was applied does not do so in the *Turner* context.

In the present case, Plaintiff's evidence fails to raise a triable issue. The fact that Plaintiff has access to similar content does not call into question the validity of Defendant Collins' decision to censor *Encyclopedia of Survival Techniques*. Defendant Collins, a prison official with over twenty-three years of service, has submitted an affidavit that states, among other things, that he censored *Encyclopedia of Survival Techniques* because he believed that "it would present a threat to facility safety and security if it were to enter the facility." The reasonableness of Collins' decision to censor a book that contains "information on survival tactics, making a crude bow and arrow and other weapons/traps, as well as navigating in the wilderness" is obvious. Therefore, Defendants are entitled to a presumption that Defendant Collins acted reasonably.[31] To overcome this presumption, Plaintiff must produce compelling evidence.[32]

---

[30]*Mauro v. Arpaio*, 188 F.3d 1054, 1060 (9th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1018 (2000). The Supreme Court's decision to adopt such a deferential reflects its understanding that the "problems of prisons in America are complex and intractable" and that "courts are particularly ill equipped to deal with these problems." *Shaw*, 532 U.S. at 229.

[31]*See, e.g., Shaw*, 532 U.S. at 232; *Monroe v. Beard*, 536 F.3d 198, 207 (3d Cir. 2008).

[32]*See Shaw*, 532 U.S. at 232 (stating that a plaintiff who seeks to "overcome the presumption that . . . prison official[s] have acted within their 'broad discretion'" bears a "heavy burden").

Because the Court does not find Plaintiff's evidence compelling, it finds, as a matter of law, that factor one favors Defendants.

**2. Alternative Means of Exercising the Constitutional Right**

When analyzing factor two, the Court is to view the right in question "sensibly and expansively."[33] In cases where the right to receive information is at issue, the question is not whether the plaintiff has other opportunities to read the exact material censored, but whether he has the right to read in general.[34] If he does, then factor two weighs in the defendant's favor.[35]

The regulation at issue here, K.A.R. 44-12-601(d), does not strip Plaintiff of his right to read in general. As is evident from the fact that Plaintiff actually received one of the books ordered, Plaintiff can view books through subscription orders. Furthermore, as a quick glance at the regulation reveals, K.A.R. 44-12-601(d) does not prohibit Plaintiff from accessing books from LCF's library, which houses at least 10,000 books. While it may be true that none of the library's books contain the exact information Plaintiff is looking for, i.e., information on how to make weapons and survive in the wild, this fact is irrelevant under factor two. As stated above, factor two does not construe the right in question so narrowly as to ask whether the Plaintiff still has access to the same information that is prohibited. As a consequence, and in consideration of the reasons stated above, the Court finds that factor two weighs in Defendants' favor.

**3. Effect of Accommodating the Right**

It is undisputed that the book censored pursuant to K.A.R. 44-12-601 contained the following: information on "how to make tools; tips on trapping and fishing; instructions on water

---

[33]*Thornburgh*, 490 U.S. at 417.

[34]*See Jolly v. Snyder*, 2003 WL 1697539, at *4 (D. Del. Mar. 22, 2003).

[35]*See Thornburgh*, 490 U.S. at 418.

navigation, crossing rivers, and making rafts; instructions on how to survive in various climates; and map marking and navigation." As recently stated in *Jones v. Salt Lake County*[36], allowing inmates to possess publications "concerning weapons, contraband and escapes would have a significant impact on the safety and security of prison personnel and other inmates."[37] In light of *Jones* and the obvious risks associated with letting survival information into a prison, the Court finds that allowing Plaintiff to receive *Encyclopedia of Survival Techniques* could negatively affect other inmates, prison personnel, and the allocation of prison resources.[38] Accordingly, the Court concludes that factor three favors Defendants.

## 4. Presence of Alternative Measures

The relevant inquiry under factor four is whether there is "an alternative that fully accommodates the prisoner's rights at a *de minimus* cost to valid penological interests."[39] The burden of showing that such alternatives exist is on the plaintiff.[40]

Here, Plaintiff has failed to point to an alternative. Nevertheless, despite this failure, Defendants have addressed the most obvious alternative: censoring only those portions of the book that violate K.R.A. 44-12-601(d). As pointed out by Defendant Collins in his affidavit, "[t]o facilitate such a procedure for all publications received by each of the nearly 10,000 inmates in KDOC control, an exponential increase in staff would be necessary and would require

---

[36]503 F.3d 1147 (10th Cir. 2007).

[37]*Id.* at 1156.

[38]*See Hays v. Commandant, U.S. Disciplinary Barracks*, 2005 WL 2016903, at *6 (D. Kan. Aug. 22. 2005).

[39]*Turner*, 482 U.S. at 91.

[40]*Id.*

an enormous additional expenditure of resources." In light of this showing and Plaintiff's failure to come forward with a feasible alternative, the Court finds that factor four favors Defendants.

## IV. Conclusion

Because Defendants failed to produce evidence in support of the alleged connection between the decision to censor *High: An Anthology of Forbidden Writings* and KDOC's interest in security, the Court denies Defendants' motion for summary judgment as it relates to that book. However, with regard to the censoring of *Encyclopedia of Survival Techniques*, based on its finding that all four of the *Turner* factors weigh in Defendants favor, the Court concludes, as a matter of law, that Plaintiff's right to receive information was not violated. Accordingly, the Court grants Defendants' motion as it relates to that matter. As for Plaintiff's motion, for the reasons stated above, the Court denies it in its entirety.

Accordingly,

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Doc. 77) is hereby DENIED in part and GRANTED in part.

**IT IS THEREFORE ORDERED** that Plaintiff's motion for summary judgment (Doc. 79) is hereby DENIED.

**IT IS SO ORDERED.**

Dated this 23rd day of December, 2009, in Wichita, Kansas.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE